# `IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
      )
    v.      )    ID. No. 1602006736
      )
ANTOINE HARRIS,      )
      )
    Defendant.      )

Submitted:  July 22, 2016
Decided:  July 25, 2016

On Defendant Antoine Harris's Motion to Suppress.  **DENIED**.

## ORDER

Michael B. DegliObizzi, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Andrew J. Meyer, Esquire, Assistant Public Defender, Wilmington, Delaware, Attorney for Defendant Antoine Harris.

**SCOTT, J.**

## Introduction

Before the Court is Defendant Antoine Harris's ("Defendant") Motion to Suppress. Therein, Defendant challenges the validity of police action, which resulted in evidence and charges against Defendant, as having violated his right against unreasonable searches and seizures of his person guaranteed under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Sections 6 and 7 of Article I of the Delaware Constitution, and Delaware law. The Court has reviewed and considered the Parties' written submissions, as well as the evidence provided and arguments made by the Parties at the suppression hearing.[1] For the following reasons, Defendant's Motion to Suppress is **DENIED**.

## Findings of Fact[2]

On February 10, 2016, Officers Richard Verna ("Ofr. Verna") and Dvon Stallings ("Ofr. Stallings") of the Wilmington Police Department ("WPD") (collectively, the "Officers") were conducting routine patrol in a marked police vehicle on the northside of the City of Wilmington, when they observed Defendant emerge from a convenience store located at the corner of 29th and Washington Streets and begin walking up the street. At that time, Ofr. Verna had been working

---

[1] Defendant filed his Motion to Suppress on June 22, 2016. The State filed its response on July 20, 2016. The suppression hearing was held on July 22, 2016.

[2] Unless otherwise noted, the findings of facts were made from the testimony of Ofr. Verna and Ofr. Stallings, which was provided at the suppression hearing.

for the WPD for approximately 6 years, and Ofr. Stallings had been working for the WPD for just over one year.

Prior to the day in question, Ofr. Verna had responded to a department flyer seeking assistance in the identification of two suspects in an unrelated shooting that occurred in the same area on January 26, 2016, where he was shown the convenience store's surveillance video of the incident and was able to identify one of the two shooters from prior experiences. Regarding the video, Ofr. Verna testified that it was of high quality, providing a clear picture of two African American suspects firing guns, and that the unidentified gunman was of average build and wore a maroon hoodie.

As a result, Ofr. Verna testified that, when he got a good look of Defendant on February 10th in the daytime, he believed that he recognized Defendant as the second shooter from the video, because Defendant fit the description being a black male of similar build and wearing a maroon hoodie. The Officers, thus, decided to try and identify Defendant through what they termed a "casual" or "soft encounter," meaning that Defendant could have left at any time. Upon circling the block, the Officers, who were in full uniform, observed Defendant walking eastbound on 30th Street, whereupon Oft. Verna parked the patrol vehicle approximately one car length away. Ofr. Stallings exited the vehicle alone, walked

2

toward Defendant without putting his hands near his gun or taser, and asked Defendant, "Hey, can I talk to you for a minute?"

Both Officers testified that, in response, Defendant immediately grabbed the front of his waistband and ran. Ofr. Verna remained in the patrolcar and informed dispatch that his partner was in pursuit of a suspect who was possibly in possession of a firearm, because based on his training and experience Defendant's actions were consistent with the characteristics of an armed gunman. Ofr. Stallings pursued Defendant on foot approximately five to eight feet behind, and testified that he observed Defendant running with his right hand tugging at his waistband in what appeared to be an attempt to retrieve or conceal a firearm based on his training and experience. He further testified that in his training and experience when a suspect flees in this manner, they are likely trying to hide something or have something on them. Ofr. Stallings testified that he maintained a clear line of sight of Defendant as he followed him down an alley to the right, but that he lost sight of Defendant for approximately two to three seconds when he made another right turn behind the houses. When Ofr. Stallings turned the corner, he saw Defendant stopped behind a tree and testified that Defendant looked at him and then started running again, but that this time Defendant's arms were free and no longer grabbing at his waistband.

Ofr. Stallings eventually apprehended Defendant and identified him as Antoine Harris. A search of Defendant's person revealed that he was in possession of money and heroin, and a search of the alley revealed a firearm.

## Parties' Contentions

Defendant argues that he was seized when Ofr. Stallings approached him and initiated conversation, because the officer's actions constituted a show of authority, which made him feel that he was not free to leave. Defendant also argues that this seizure was illegal, because Officers lacked sufficient reasonable suspicion at this time to stop him, when nothing they observed suggested that Defendant had committed, was committing, or was about to commit a crime. Therefore, any evidence obtained as a result of the unlawful stop should be suppressed as fruit of the poisonous tree.

The State argues that there was no seizure when the Officers approached Defendant and Ofr. Stalling asked, "Hey, can I talk to you for a minute," because the attempted interaction was merely a consensual encounter. Alternatively, at that time, the Officers had reasonable and articulable suspicion to perform an investigatory stop of Defendant pursuant to 11 *Del. C.* § 1902, based on Ofr. Verna's belief that the individual he saw on Washington Street was the unidentified suspect from the video of the January shooting incident. Further, any mistake of fact by Ofr. Verna regarding the actual identity of Defendant does not

4

negate the Officers' reasonable suspicion. The State also argues that Defendant's eventual flight from the attempted consensual encounter on West 30th Street is properly considered in determining the Officers' reasonable suspicion supporting Defendant's ultimate arrest.

## Standard

On a motion to suppress evidence seized during a warrantless search, the State bears the burden of establishing that the challenged search or seizure did not violate the rights guaranteed a defendant by the United States Constitution, the Delaware Constitution, and Delaware statutory law.[3] The burden of proof on a motion to suppress is proof by a preponderance of the evidence.[4]

## Discussion

An individual's right to be free from unlawful governmental searches and seizures in Delaware is secured by two independent sources.[5] The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[6] Likewise, Article I, Section 6 of the Delaware Constitution guarantees that "[t]he people shall be secure in their persons, houses,

---

[3] *Hunter v. State*, 783 A.2d 558, 560-61 (Del. 2001).

[4] *State v. Anderson*, 2010 WL 4056130, at *3 (Del. Super. Oct. 14, 2010) (citing *State v. Bien-Aime & Smalls*, 1993 WL 138719, at *3 (Del. Super. Mar. 17, 1993).

[5] This right has been codified by title 11, chapter 23 of the Delaware Code. 11 Del. C. § 2301 *et seq*.

[6] U.S. Const. amend. IV. The Fourteenth Amendment makes the Fourth Amendment applicable to the states. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

papers and possessions, from unreasonable searches and seizures . . . ."[7]  Searches and seizures are presumptively unreasonable, unless they are authorized by warrants or fall under a recognized exception to the warrant requirement.[8]

In *Terry v. Ohio*, the United States Supreme Court held that a police officer may conduct a brief, investigatory detention of an individual based on the officer's reasonable and articulable suspicion that criminal activity is afoot.[9]  In similar fashion, Delaware's Detention Statute allows a police officer to detain an individual for investigatory purposes if the detention is supported by "reasonable ground" to suspect that the individual "is committing, has committed or is about to commit a crime."[10]  The term "reasonable ground," as used in 11 Del. C. § 1902(a), has the same meaning as "reasonable and articulable suspicion" as defined by *Terry*.[11]

Where it is shown that there has been a violation of a defendant's right to be free from illegal searches and seizures, the exclusionary rule acts as the remedy.[12] The rule requires that any evidence recovered or derived from an illegal search and

---

[7] Del. Const. art. I, § 6.
[8] *Mason v. State*, 534 A.2d 242, 248 (Del. 1987).
[9] 392 U.S. 1, 30 (1968).
[10] 11 *Del. C.* § 1902(a).
[11] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).
[12] *Id.* at 872.

seizure must be excluded from evidence, in the absence of an independent source for or a situation allowing for the inevitably discovery of the evidence.[13]

## A. The Initial Encounter

It is well settled that, where police officers have reasonable suspicion of criminal activity on the part of a person, they have the authority to stop and detain that person.[14] Generally, a seizure occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty" of the individual, because "not all personal intercourse between policemen and citizens involves 'seizures' of persons."[15] However, in *Jones v State*, the Delaware Supreme Court held that, because the search and seizure language in Article I, § 6 of the Delaware Constitution provides greater protections to individuals than its federal counterpart, determining whether a seizure occurred under the Delaware Constitution "requires focusing upon the police officer's actions to determine whether a reasonable person would have believe he or she was not free to ignore the police presence."[16] Applying this rule to the facts before it, the *Jones* Court found that, where the police officer exited his vehicle, approached the defendant,

---

[13] *Id.* (citations omitted).
[14] *Terry*, 392 U.S. at 22.
[15] *Id.* at 19 n.16.
[16] 745 A.2d at 869.

and ordered him to stop and remove his hands from his coat pockets, the police officer engaged in conduct constituting a seizure of the defendant.[17]

Over the next 20 years, the Delaware Supreme Court continued to refine its analysis of whether a police officer's interaction with an individual amounts to a seizure or merely constitutes a "consensual encounter." In *Ross v. State*, the Court held that "the presence of uniformed police officers following a walking pedestrian and requesting to speak with him, without doing more, does not constitute a seizure under Article I, § 6 of the Delaware Constitution."[18] In *Ross*, the police officers slowly drove alongside the defendant, who appeared to notice them and turned to walk away, and then stopped their car, got out, and began requesting an interview, asking repeatedly, "Can we talk to you?" as they followed the defendant.[19] The Court held that the lower court had properly concluded that this police conduct did not amount to a seizure.[20] Similarly, in *Williams v. State*, the Supreme Court found that, where the officer observed the defendant walking on a highway median, parked his patrol car ten feet behind him, activated his strobe light, and merely approached him to ask if he needed a ride, under the totality of the circumstances the interaction was merely a consensual encounter and not a seizure.[21] Finally, in

---

[17] *Id.* at 859, 869.
[18] 925 A.2d 489, 494 (Del. 2007).
[19] *Id.* at 491.
[20] *Id.* at 494.
[21] 962 A.2d 210, 213, 215-16 (Del. 2008) ("During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business.").

*Harris v. State*, the Supreme Court found that the defendant was not seized while sitting in his vehicle parked behind a bar, when the officer stopped and exited his patrol car approximately ten feet behind him, approached the defendant, and asked him, first, if everything was alright and then other general questions.[22]

In the instant matter, the facts and circumstances are more similar to *Ross*, *Williams*, and *Harris*, where no seizures occurred, than to *Jones*, because the testimony shows that Defendant was merely posed a question and was not ordered or commanded to do anything. Furthermore, the testimony clearly shows that the encounter *sub judice* pales in comparison to the level of intrusion occasioned by the casual encounters in *Ross*, *Williams*, and *Harris*, because, here, only one of the two Officers actually exited the vehicle and approached Defendant, this Officer merely asked Defendant one time if he could talk to him, and no other officers even approached Defendant. The record is simply devoid of any evidence that Ofr. Stallings ordered Defendant to do anything, that any officers surrounded Defendant, prevented him from leaving, or made any other show of force that would cause a reasonable person to believe he or she was not free to ignore their presence. As this Court has previously explained, "[w]hile there is an inherent aura of authority in any . . . encounter with uniformed police officers, this factor alone does not elevate the encounter to a seizure."[23] Therefore, after considering

---

[22] 12 A.3d 1154 (Del. 2011) (TABLE), 2011 WL 252945, at *1.
[23] *State v. Baker*, 2011 WL 2535792, at *6 (Del. Super. June 20, 2011).

the Officers' conduct toward Defendant under the totality of the circumstances, the interaction constituted a consensual encounter, if one could even call it that based on the scant interaction between the Officers and Defendant before he fled, and not a seizure.[24]

## B. Reasonable Suspicion to Stop Defendant

Delaware courts define reasonable suspicion as an officer's ability to point to specific and articulable facts which, combined with all rational inferences, reasonably warrant the intrusion.[25] Therefore, even assuming, *arguendo*, that Defendant was seized when the Officers approached him and said, "Hey, can I talk to you for a minute," under the totality of the circumstances, the Officers had reasonable suspicion to stop Defendant, based on Ofr. Verna's belief that Defendant was the second shooter in the surveillance video of the January shooting case, the similar location, and the Officers' combined belief that Defendant was trying to evade them.

---

[24] *See Curtis v. State*, 15 A.2d 216 (Del. 2011) (TABLE), 2011 WL 825827, at *2 ("In this case, the mere presence of [the officer in a police vest] for a fraction of a second—or even a few seconds—would not cause a reasonable person in [the defendant's] position to believe he could not ignore the police presence."); *Woody v. State*, 765 A.2d 1257, 1264 (Del. 2001) (finding no encounter where the defendant fled almost immediately upon seeing one of the officers approaching and before any of the officers attempted to effectuate a detention); *see also State v. Roy*, 2011 WL 917416, at *4 (Del. Super. Mar. 17, 2011) (finding the defendant was seized when the officer said to him, "[c]ome here, Carl").
[25] *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989).

In weighing the evidence, the court "defers to the experience and training of law enforcement officers."[26] A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.[27] Lastly, "[r]easonable suspicion is a less demanding standard compared to probable cause and only requires a showing considerably less than preponderance of the evidence."[28]

In *Jones*, the Supreme Court found that the officer lacked a reasonable and articulable suspicion to stop the defendant, because he primarily relied on the anonymous 911 complaint merely reporting that a suspicious black male wearing a blue coat had allegedly been standing in front of a particular address.[29] The Court found the fact that Defendant's location and general physical description were similar to the individual described in the uncorroborated 911 complaint and the fact that the events took place at night in a high crime/drug area did not constitute reasonable and articulable suspicion sufficient to justify the officer's stop of the defendant.[30]

---

[26] *Woody*, 765 A.2d at 1262.
[27] *Id.* at 1263(citing *Jones*, 745 A.2d at 860).
[28] *Id.* at 1262 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).
[29] *Jones*, 745 A.2d at 858, 869-70.
[30] *Id.* at 871-72.

The facts of the instant case are distinguishable from the outset, because the Officers were not acting on the basis of an unreliable anonymous tip, 911 or otherwise. Rather, Ofr. Verna testified that he personally viewed a surveillance video in connection with the investigation of an unrelated crime, where he saw an individual who resembled Defendant illegally shooting a gun. In deference to Ofr. Verna's testimony regarding the circumstances of the surveillance video and his ability to recall the second shooter's appearance, which appeared to be credible, the Court believes that Ofr. Verna reasonably suspected that Defendant was involved in the January shooting when he saw him on February 10, 2016. Therefore, Ofr. Verna had reasonable and articulable suspicion to believe Defendant had committed a crime.[31]

## Conclusion

For the foregoing reasons, Defendant's Motion to Suppress is hereby **DENIED**.

**IT IS SO ORDERED.**

/s/ Calvin L. Scott
**The Honorable Calvin L. Scott, Jr.**

cc:    Prothonotary

---

[31] *See id.* at 871 ("Reasonable and articulable suspicion cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing, or is about to commit a crime.").