**Josiah WOODY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 475, 1999.**

Supreme Court of Delaware.

Submitted: Nov. 16, 2000.
Decided: Jan. 24, 2001.

19. *Milligan,* 761 A.2d at 11 (citing *Floray v. State,* Del.Supr., 720 A.2d 1132, 1137–38 (1998)).

Bernard J. O'Donnell, Assistant Public Defender, Office of the Public Defender, Wilmington, Delaware, for appellant.

William E. Molchen, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for appellee.

BEFORE: VEASEY, C.J., WALSH, HOLLAND, BERGER, and STEELE, JJ., constituting the Court en Banc.

WALSH, Justice:

In this appeal from the Superior Court, we examine the question of whether flight from the police may be considered as a factor justifying apprehension. We conclude that, given the unusual and suspicious circumstances surrounding the defendant's flight, the police were entitled to confront him and the Superior Court correctly concluded that the weapon subsequently seized from the defendant should not have been suppressed. Accordingly, we affirm.

I

At approximately 9:30 p.m., on January 14, 1999, Wilmington Police Sergeant Henry Alfree, while on patrol in an unmarked police car in the East Lake Housing Project, noticed the defendant, Josiah Woody ("Woody"), and two other men standing behind a residence at 729 East 26th Street.

Officer Alfree was working as part of a surveillance team accompanied by three officers on foot patrol. The area in question had been the subject of several complaints of drug dealing and was considered by police to be a high crime area. Indeed, the police had made an arrest in the same location two weeks previously.

Upon observing the men, Officer Alfree notified the remaining members of his team, Officers Vincent Jordan, Thomas Dempsey and Thomas Looney, all in uniform, of his location and the location of the three individuals. As Officer Alfree exited his unmarked vehicle and approached the rear yard, Woody turned and walked toward the front of the residence. Woody then ran back toward the rear door of the house after seeing the three uniformed officers entering the yard from another direction.[1] The other two individuals remained at the scene.

Officer Jordan, who was approximately ten to fifteen feet away, noticed that Woody, while running, was clutching a bulge in his left front coat pocket that Jordan believed to be either a weapon or a large amount of drugs. Officers Jordan and Dempsey identified themselves as police officers and ordered Woody to stop. Woody did not stop and was subsequently tackled and handcuffed in the doorway by Officer Jordan. The police patted down Woody and found a loaded .38 caliber revolver in his left front coat pocket. Woody was arrested and subsequently charged with possession of a concealed deadly weapon and resisting arrest.

Prior to trial Woody filed a motion to suppress the gun found on his person on the ground that the police lacked probable cause to arrest him. Alternatively, Woody argued that even if the police had probable cause, they still needed a warrant because, without exigent circumstances, he should not have been arrested within the curtilage of his residence.

---

**1.** All rear yards in the block in question were unfenced and opened directly onto a vehicu-

lar fire alley that was open and illuminated.

The Superior Court denied Woody's motion to suppress, finding that under the totality of the circumstances the police had probable cause to arrest him. The court stated that, although flight alone may not have given the police probable cause to detain him, the supporting facts of being in a high crime area where the police have had numerous complaints of criminal activity coupled with seeing Woody holding the suspicious bulge in his pocket, gave the police probable cause to detain him. The court also found that the police did not need a warrant to arrest Woody because the backyard where the police observed him was clearly exposed to public view and he could have no expectation of privacy at that location.

## II

Woody argues that his arrest and the subsequent search of his person were not supported by probable cause and the Superior court erred in denying his Motion to Suppress the gun seized from his person. In opposition, the State contends that, given the attendant circumstances, including Woody's flight and the officers' observation of a bulge that looked like a weapon, there was a reasonable basis to suspect criminal activity. This suspicion was sufficient to support a detention during the course of which police discovered the gun on Woody's person, justifying a subsequent arrest. In denying Woody's motion to suppress, the Superior Court adopted the State's view of the evidence.

 Although we are called upon to decide an issue with constitutional dimensions, our standard of review is one of deference to the factual findings of the Superior Court, following an evidentiary hearing. We review the trial court's refusal to grant the motion to suppress evidence under an abuse of discretion standard. *See Gregory v. State*, Del.Supr., 616 A.2d 1198, 1200 (1992). Thus, Woody's conviction can be reversed only if this Court finds the Superior Court's decision to be clearly erroneous. *See Potts v. State*, Del. Supr., 458 A.2d 1165, 1168 (1983).

The standard of review is significant in this case because the Superior Court conducted an evidentiary hearing at which the defendant and the arresting officers testified. The defendant denied any evasive movements, running or change of direction after observing the police. The trial court determined as a matter of credibility that Woody did run from the police in one direction and then alter his course to attempt to enter the rear door of his house. The Superior Court resolved the differences in testimony in the following findings:

> First, the Court must determine whether police had valid cause to detain or arrest Defendant. As an initial matter, the Court finds the testimony of Officer Jordan that Defendant walked around the corner of the house out of sight and then ran to the back door and attempted to enter the house to be the more credible version of the events leading up to Defendant's arrest. Although Defendant's flight, by itself, may not have been sufficient cause for police to detain Defendant, Officer Jordan also testified that he saw that [sic] Defendant holding his jacket pocket as he ran and that he could see the pocket contained a heavy object which he believed was either a gun or a large quantity of drugs. In addition, Officer Jordan testified the area was a high crime area and that the police had had numerous complaints of drug dealing and other criminal activity. Under the totality of the circumstances, the Court finds that these factors combined provided the police with probable cause to arrest Defendant.

It is against these factual findings that the Superior Court concluded probable cause must be tested.

Woody contends that his arrest and the search of his person violated the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution because the officers lacked

probable cause. Further, Woody contends the officers did not possess reasonable articulable suspicion that he had engaged in or was about to engage in criminal activity to justify his detention. Upon careful consideration of the protections afforded Woody under the Fourth Amendment and Article I, § 6 of the Delaware Constitution, and in light of the totality of the circumstances as they appeared to the officers on the evening in question, we conclude that the unique facts of this case justified Woody's detention. In addition, we find the officers had probable cause to arrest Woody after a loaded weapon was discovered on his person pursuant to a properly performed protective pat down.

█ An individual's right to be free from unreasonable governmental searches and seizures is secured by the Fourth Amendment of the United States Constitution. *See Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Quarles v. State,* Del.Supr., 696 A.2d 1334, 1336 (1997). The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. This protection applies to the states through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The right of the citizens of Delaware to be free from such governmental intrusion is further secured by Article I, § 6 of the Delaware Constitution, which provides that: "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures...." Del. Const. art I, § 6. *See also Jones v. State,* Del.Supr.,

745 A.2d 856, 860 (1999); *Dorsey v. State,* Del.Supr., 761 A.2d 807 (2000).

█ Generally, law enforcement officers may arrest an individual only if the seizure is supported by probable cause. *See Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In certain circumstances, however, law enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual to be detained is committing, has committed, or is about to commit a crime. *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868; *Jones,* 745 A.2d at 861; 11 *Del.C.* § 1902.[2] A stop or detention constitutes a seizure of the person, but, in terms of duration and scope, it is a much more limited intrusion than an arrest. *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868; *Quarles,* 696 A.2d at 1337. The Supreme Court has determined that such a limited intrusion is reasonable under the Fourth Amendment. *See Terry,* 392 U.S. at 30–31, 88 S.Ct. 1868.

█ In determining whether there was reasonable suspicion to justify a detention, the Court defers to the experience and training of law enforcement officers. *See Jones,* 745 A.2d at 861; *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Carter,* D.Del., No. CRIM. A. 99–50–MNS, 1999 WL 1007044, at \*4, Schwartz, J. (Oct. 22, 1999). The requirement that law enforcement officers demonstrate reasonable suspicion to justify a stop is not a nebulous one. Rather, "the police officer must be able to point to specific and articulable facts which, taken together with rational

2. These principles have been codified in Delaware. 11 *Del.C.* § 1902 provides:

(a) A peace officer may stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and destination [where he is going].

(b) Any person so questioned who fails to identify himself or explain his actions to the

satisfaction of the officer may be detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

inferences from those facts, reasonably warrant th[e] intrusion." *Jones*, 745 A.2d at 861 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868); *see also Royer*, 460 U.S. at 498, 103 S.Ct. 1319. An officer's subjective impressions or hunches are insufficient. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (stating that police "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch") (internal quotation marks omitted). There must be an objective justification for making the stop, but "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence...." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In determining whether reasonable suspicion exists, we must examine the totality of the circumstances surrounding the situation "as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts." *Jones*, 745 A.2d at 861 (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *accord Quarles*, 696 A.2d at 1336. With these principles in mind, we examine whether the facts of this case demonstrate the officers possessed reasonable articulable suspicion of criminal activity prior to detaining Woody.

The Superior Court cited three factors supporting Woody's detention: (1) the high crime nature of the area; (2) Woody's flight upon seeing Officer Alfree approaching; and (3) the officer's testimony that there was a large bulge in Woody's jacket that he was holding while running. Woody contends that the high crime nature of the area in which he was apprehended does not amount to reasonable suspicion and neither does his attempt to flee the officers nor the bulge observed in his pocket. Furthermore, Woody contends that the officer's observation of a bulge in his coat pocket may not be considered in determining reasonable suspicion because it was the fruit of an initial, illegal encounter. The State responds that the officers were justified in making this stop because each factor considered together amounts to reasonable suspicion of criminal activity. We agree with the State that, considering these factors together, including Woody's unprovoked flight, under the totality of the circumstances, the officers had reasonable articulable suspicion of criminal activity justifying Woody's detention.

■■■■ As a preliminary matter, it is necessary to our analysis to determine when Woody was seized. Law enforcement officers must be aware of the facts constituting reasonable suspicion before a detention is effectuated. *See Jones*, 745 A.2d at 874. An illegal stop cannot be justified by circumstances that arise following its initiation. *See id; cf. Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 1379, 146 L.Ed.2d 254 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").[3]

In this Court's recent decision *Jones v. State*, we addressed the situation where an officer did not formulate reasonable articulable suspicion prior to seizing an individual. In *Jones*, a police officer arrived at the

---

3. Nevertheless, law enforcement officers are permitted to initiate contact with citizens on the street for the purpose of asking questions. *See Royer*, 460 U.S. at 498, 103 S.Ct. 1319; *Terry*, 392 U.S. at 32–33, 88 S.Ct. 1868 (Harlan, J. concurring); *United States v. Hernandez*, 8th Cir., 854 F.2d 295, 297 (1988). This type of situation is referred to as an encounter. *See id.* A consensual encounter between law enforcement officers and members of the public does not amount to a seizure and therefore does not implicate the Fourth Amendment. *See Quarles*, 696 A.2d at 1337 n. 1. Because it is a consensual situation, it is equally true, however, that an individual has no obligation to answer the officer's inquiry and may go about his or her business. *See Royer*, 460 U.S. at 498, 103 S.Ct. 1319. Law enforcement officers must have an objective justification for their actions if the individual is detained. *See id.*

location where Jones and others were standing after receiving an anonymous tip that an individual matching Jones' description was acting suspicious. The officer exited his vehicle and approached Jones, ordering him to stop and remove his hands from his pockets. Jones did not comply and began to walk away. After making three more requests to stop, the officer grabbed Jones' hands in order to remove them from his pockets. A struggled ensued and Jones threw something on the ground that was later determined to be cocaine. This Court held that:

> In our view, the question presented by Jones of when a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence. Under that analysis, Jones was seized within the meaning of Section 1902 and Article 1, § 6 when Patrolman Echevarria first ordered him to stop and remove his hands from his pockets.

745 A.2d at 869. Therefore, we held that Jones's refusal to stop and cooperate with police could not be considered as a factor in the analysis, stating that "[i]f an officer attempts to seize someone before possessing a reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially." *Id.* at 874.

■ The present facts are distinguishable from *Jones*. Here, unlike Jones,

Woody fled before any of the officers attempted to effectuate a detention.[4] Under the Delaware Constitution, in accordance with the analysis set forth in *Jones*, Woody was not seized until Officers Jordan and Dempsey ordered him to stop.[5] Officer Alfree approached the defendant and his companions with the stated intention of questioning them, an entirely permissible act. *See Royer*, 460 U.S. at 498, 103 S.Ct. 1319. An individual may walk away from an officer who initiates an encounter and refusal to cooperate with the officer cannot be the sole grounds constituting reasonable suspicion. *See id.* Unlike Jones, however, Woody fled upon seeing Officer Alfree approaching him and his companions. When Woody saw the other three officers approaching from the other direction, he turned and ran toward the back door of his residence. While Woody was running toward the back door, Officer Jordan noticed that Woody was grasping a large bulge in his front left coat pocket, which the officer believed to be either a large quantity of drugs or a weapon. At this time, the officers ordered Woody to stop.[6] Therefore, all the facts considered by the Superior Court in the reasonable suspicion analysis were known to the officers before Woody was seized.

■ Having concluded that the facts cited by the officers as forming their basis for reasonable suspicion did not stem from an illegal detention, we next address whether it is proper to consider an individual's unprovoked, headlong flight as a factor in the reasonable suspicion analysis.

4. Moreover, because Woody's flight was unprovoked and almost immediate upon his seeing Officer Alfree approaching, there was no encounter between Woody and the police.

5. The analysis in *Jones* was based on Article I, § 6 of the Delaware Constitution. We interpreted the Delaware Constitution as providing more protection than the Fourth Amendment. In doing so, we declined to adopt the United States Supreme Court's analysis in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), regarding when a seizure occurs and instead retained the "free

to leave test" as refined in *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). *Jones*, 745 A.2d at 863–64, 868–69; *see also Quarles*, 696 A.2d at 1337 (mentioning *California v. Hodari D.* but applying *Chesternut* standard to determine when seizure occurred).

6. Under the Delaware Constitution, and pursuant to *Jones*, Woody was seized when the officers ordered him to stop because at this point a "reasonable person would have believed he or she was not free to ignore the police presence." *Jones*, 745 A.2d at 869.

As previously stated, law enforcement officers may approach and ask questions of an individual, without reasonable articulable suspicion that criminal activity is afoot. The individual, however, may not be detained and may walk or even run away. Refusal to answer the officer's inquiry cannot form the basis for reasonable suspicion. *See Royer,* 460 U.S. at 497–98, 103 S.Ct. 1319. Moreover, in *Jones,* we stated that "[i]f an officer attempts to seize someone before possessing a reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially." *Jones,* 745 A.2d at 874. We are presented here with a different situation, however, because Woody fled before the officers initiated any contact with him.

The question of whether unprovoked, headlong flight can be considered a factor in a reasonable suspicion analysis was recently addressed by the United States Supreme Court. *See Wardlow,* 528 U.S. 119, 120 S.Ct. 673. In *Wardlow,* law enforcement officers were driving through an area known for heavy narcotics trafficking. *See id.* at 121, 120 S.Ct. 673. The defendant was apprehended after he fled upon seeing the police drive into the area. *See id.* at 122, 120 S.Ct. 673. The officers conducted a protective pat down search and discovered a loaded weapon. *See id.* The Court viewed Wardlow's headlong flight, despite its potentially innocent character, as a factor to be considered in determining whether the officers possessed reasonable articulable suspicion because flight, even though not illegal in and of itself, is the ultimate act of evasion and therefore suggestive of wrongdoing. *See id.* at 124, 120 S.Ct. 673. The Court concluded the officers were justified in suspecting Wardlow was engaged in criminal activity based on his presence in a high crime area and his unprovoked flight upon seeing the law enforcement officers enter the neighborhood. *See id.* at 125, 120 S.Ct. 673.

When Officer Alfree approached the three men standing behind Woody's house only Woody fled. The other two men, one of whom was Woody's brother, remained in the rear yard area. Under the circumstances, we believe Woody's flight reflected "nervous, evasive behavior," suggestive of wrongdoing, and may properly be considered in a reasonable suspicion analysis. *See Wardlow,* 528 U.S. at 124, 120 S.Ct. 673. There doubtless may be legally plausible explanations for an individual's flight upon the approach of law enforcement personnel and we do not mean to suggest that whenever police witness an individual moving or running away from them it is necessarily indicative of criminal activity. *See generally Cummings v. State,* Del.Supr., 765 A.2d 945 (2001). But such behavior may be a factor to be considered in the analysis. *See Wardlow,* 528 U.S. at 124, 120 S.Ct. 673.

The next factor considered by the Superior Court in its analysis is the high crime nature of the area in which Woody was apprehended. Again that fact alone is insufficient to constitute reasonable suspicion. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The high crime nature of the area where the detention occurred, however, is a "relevant contextual consideration" in a reasonable suspicion analysis. *See Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 (citing *Adams v. Williams,* 407 U.S. 143, 144 and 147–148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

In this case, the officers testified that Woody's immediate neighborhood, the area of the seven and eight hundred block of East 26th Street and East 27th Street, which comprises part of the East Lake Housing Project, is a high crime neighborhood. Indeed, an individual was arrested in that same area 10 days prior to this incident for selling crack cocaine. In addition, the officers testified the police frequently receive complaints that drug dealing and other criminal activity takes place

in this locality. Based on these facts, we believe it was proper for the Superior Court to consider the high crime nature of the area in which this incident occurred. *Cf. Carter*, 1999 WL 1007044 at *4 (declining to consider high crime nature of area as factor in analysis because there was no specific evidence establishing that the area where stop occurred had a reputation for criminal activity).

■ The final factor in the inquiry is the officers' observation of Woody holding a bulge in his pocket that appeared to be either a gun or a large quantity of drugs. This is certainly a factor to be considered in determining whether Woody was engaged in criminal activity and was properly considered by the Superior Court. Examining these factors in light of the totality of the circumstances as they appeared to the officers that evening, we believe that the officers possessed sufficient facts to formulate reasonable articulable suspicion that Woody was engaged in criminal activity. Therefore, we conclude Woody's detention was proper.

### III

■ We next consider whether the search of Woody's person was constitutional. After apprehending Woody, the officers conducted a protective pat down. During the pat down, Officer Looney felt what he believed to be a weapon in Woody's front left coat pocket. Officer Dempsey reached into the pocket and removed a fully loaded .38 caliber hand gun. Woody contends this search was illegal because it was not supported by probable cause.

■ Law enforcement officers, pursuant to a lawful detention, may conduct a protective pat down if the officer justifiably believes the detained individual may be in possession of a weapon or weapons that could be used to harm the officer. *See Terry*, 392 U.S. at 27, 30–31, 88 S.Ct. 1868. The pat down is designed "not to discover evidence of crime, but to allow the

officer to pursue his investigation without fear of violence...." *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). For this reason, a pat down is limited to a search of the suspects outer clothing. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868. If, during the course of a pat down, the officer feels something he or she reasonably believes to be contraband or a weapon, the officer may go into the suspect's pocket where the suspicious item is located. *See Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Terry*, 392 U.S. at 29–30, 88 S.Ct. 1868; *Dickerson v. State*, Del.Supr., 620 A.2d 857 (1993) (ORDER).

In this case, the officers had the necessary reasonable suspicion to stop Woody. In addition, the officers were justified in conducting a protective pat down of Woody. As he was trying to flee, Woody was grasping a large bulge in his coat pocket. Two of the officers at the scene identified the bulge in Woody's pocket as either a weapon or contraband. The articulable suspicion that the bulge felt like a weapon is certainly a sufficient basis on which to conclude Woody may be armed and dangerous. Therefore, the protective frisk was justified.

### IV

■ Finally, we address whether Woody's warrantless arrest was proper. A warrantless arrest is valid under the Fourth Amendment if there is probable cause to believe the person to be arrested has committed a felony. *See Quarles*, 696 A.2d at 1337; *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1177 (1989). This standard has been codified in 11 *Del.C.* § 1904(b)(1), which provides, in pertinent part that: "An arrest by a peace officer without a warrant for a felony ... is lawful whenever: (1) The officer has reasonable ground to believe that the person to be arrested has committed a felony...." The phrase "reasonable ground to believe" has been interpreted to be the equivalent of "probable cause." *See Hovington v. State*, Del.Supr.,

616 A.2d 829, 832–33 (1992); *Jarvis v. State,* Del.Supr., 600 A.2d 38, 43 (1991); *Coleman,* 562 A.2d at 1177; *Thompson v. State,* Del.Supr., 539 A.2d 1052, 1055 (1988). In determining whether probable cause exists, this Court looks at the "totality of the circumstances." *Coleman,* 562 A.2d at 1177 (citing *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *Hovington,* 616 A.2d at 832–33.

Woody contends the officers did not have probable cause to arrest because the officers illegally seized the weapon from him. This argument fails, however, because we have already determined that the officers acted properly. As the State points out, this is a case of "escalating suspicions." Initially, the officers possessed reasonable suspicion to believe Woody was engaged in criminal activity. After detaining Woody, and conducting a protective pat down for weapons, the officers discovered a loaded weapon, confirming their suspicions. Upon discovering the weapon in Woody's pocket, the officers possessed probable cause to believe Woody was committing a felony. Therefore, Woody's arrest was proper.

## V

In light of the unique circumstances of this case, we conclude that Woody's detention was supported by reasonable suspicion. Furthermore, we find that the officers were justified in conducting a protective pat down and that the discovery of a weapon on Woody's person constituted probable cause to make a warrantless arrest. Therefore, the Superior Court properly denied Woody's motion to suppress and the judgment of the Superior Court is AFFIRMED.